# IN THE COURT OF APPEALS OF IOWA

No. 23-1682
Filed July 2, 2025

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**HENRY EARL DINKINS,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Scott County, Henry W. Latham II, Judge.

A defendant convicted of first-degree murder and first-degree kidnapping appeals his convictions. **AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Theresa R. Wilson, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Joseph D. Ferrentino, Assistant Attorney General, for appellee.

Considered without oral argument by Greer, P.J., Badding, J., and Vogel, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2025).

**VOGEL, Senior Judge.**

Henry Dinkins was convicted of first-degree murder and first-degree kidnapping following the abduction and death of a ten-year-old girl, B.T. Dinkins appeals those convictions, arguing the State failed to prove each offense beyond a reasonable doubt. Viewing the evidence in the light most favorable to the State, we find sufficient evidence supports his convictions. Thus, we affirm.

### I. Factual Background and Proceedings.

In July 2020, Dinkins arranged for his eight-year-old son, D.L., to spend the night at his apartment. Dinkins and D.L.'s mother, Aishia, were not living together; D.L. lived with Aishia and his two half-siblings—one of which was B.T., a ten-year-old girl. On July 9, Dinkins arrived to pick up D.L., but D.L. wanted B.T. to go with him, which she did. At Dinkins's apartment—which he shared with his girlfriend, Andrea, in Davenport—the two children played video games and later went to sleep in the main bedroom. They each slept in a 4XL white t-shirt, provided by Dinkins.

Around 3:00 a.m. on July 10, Andrea awoke and noticed Dinkins and B.T. were not in the apartment. Andrea called Dinkins to ask where he was, but his phone was turned off. Concerned, Andrea stayed up to see if Dinkins would return with B.T., and Dinkins indeed entered the apartment around 3:30 a.m. Andrea tried to talk to Dinkins, but he merely grabbed an item Andrea could not see from his closet and told her, "I'll be back." Andrea then looked outside and saw B.T. standing next to Dinkins's vehicle—a Chevrolet Impala—still wearing the white t-shirt she wore to bed. Dinkins then drove away, presumably with B.T. as she was no longer standing where Andrea had just seen her.

Surveillance footage picked up Dinkins at a gas station a few minutes later. He entered the shop and bought gas, cigarettes, and a lighter from the clerk. During the sale, Dinkins closely monitored his Impala, glancing at the car seven times in one minute.

Dinkins was next seen again—alone—around 4:30 a.m. by a man, Jerod Brink. Brink was driving down Highway 61 on his way to work when he noticed Dinkins on the side of the road trying to flag him down. Brink pulled over and Dinkins explained his car was stuck in a ditch. Brink then drove Dinkins to where his car had gone off the road and helped Dinkins pull his Impala out of the ditch. The location where Dinkins's Impala was stuck was next to Kunau Implement in DeWitt—just north of a pond.

Around 6:00 a.m., Dinkins returned to the apartment and picked up D.L. B.T. was not with Dinkins. He then drove with D.L. to a Walmart in Clinton, despite another Walmart being located very close to the apartment in Davenport. A receipt showed Dinkins bought two jugs of bleach from the Clinton Walmart at 7:08 a.m. From there, Dinkins drove with D.L. back to the pond near Kunau Implement. D.L. stayed in the car but observed his father pour bleach near some bushes. The two then drove back to Davenport but went to Dinkins's motor home instead of the apartment.

A little after 8:00 a.m., Dinkins called Aishia and told her he had just awakened and discovered that B.T. was missing. He told her he was heading to the police station, but when Aishia later called the police to report B.T. missing, they confirmed Dinkins had not been at the station. An officer later met Aishia and Dinkins at the apartment. The officer asked Dinkins for some identifying

information, and Dinkins claimed he did not know his home address or his phone number. The officer then obtained consent to look around the apartment to see if B.T. was perhaps hiding. While the officer searched, Dinkins discretely left the scene. Over the next three hours, he ignored six phone calls and a text message from law enforcement.

Dinkins appeared at the police station around noon. During his police interview, Dinkins reported looking for B.T. in the Quad Cities area but could not identify where he searched on a map. His attire during the interview was also significant, as he had changed part of his outfit for a third time. After leaving the apartment with B.T. around 3:30 a.m., the gas station camera footage showed Dinkins wearing a tank top, colorful shorts, and gold shoes. A few hours later he appeared on camera at the Clinton Walmart wearing a different shirt, different pair of shorts, but the same gold shoes. By the time he arrived at the police station, he was wearing a different pair of shoes.

The investigation stalled until March 2021, when three men were fishing in the pond near Kunau Implement and saw a skull. The men then observed what appeared to be human remains and called 911. The remains were concealed under last year's leaves and branches—some of which appeared to have been cleanly cut and deliberately placed. The body wore a 4XL white t-shirt, and seashells were affixed to black dreadlocks, all of which matched what B.T. was last seen wearing and Aishia's description of B.T.'s hairstyle. DNA testing and dental records confirmed it was B.T.'s body.

The cause of death was determined to be a homicide—B.T. had been shot three times. Divers recovered a .38 caliber revolver in the pond, with six spent casings; the type of gun capable of firing the rounds that killed B.T.

Dinkins was charged with first-degree murder and first-degree kidnapping. After a nearly three-week bench trial, the court convicted Dinkins of both offenses. He was sentenced to two consecutive life sentences. Dinkins now appeals, disputing whether sufficient evidence supports either conviction.

## II. Analysis.

Our sufficiency-of-the-evidence standard is well established. Reviewing for legal error, we will affirm the verdict "if it is supported by substantial evidence." *State v. Kieffer*, 17 N.W.3d 651, 655 (Iowa 2025). Substantial evidence is that which "is sufficient to convince a rational fact finder the defendant is guilty beyond a reasonable doubt." *Id.* (cleaned up). Across our "highly deferential" review, we will "draw all legitimate inferences and presumptions that may fairly and reasonably be deduced from the record in favor of the State." *State v. Stendrup*, 983 N.W.2d 231, 241 (Iowa 2022).

To convict Dinkins of first-degree murder, the State needed to prove beyond a reasonable doubt Dinkins "willfully, deliberately, and with premeditation" killed B.T. *See* Iowa Code § 707.2(1)(a) (2020). For first-degree kidnapping, the State needed to prove beyond a reasonable doubt Dinkins confined or removed B.T. from one place to another, without authority or consent, with the intent to inflict serious injury, and as a result of the kidnapping B.T. suffered serious injury. *Id.* §§ 710.1(3), 710.2(1). Both Dinkins and the State analyze the evidence supporting the two convictions together, and we follow their approach.

Dinkins argues the State failed to prove that Dinkins transported B.T. to the pond and killed her. Specifically, he argues that B.T. was seen alive with Dinkins 3:30 a.m., but was not with Dinkins by 5:55 a.m., and the State did not prove beyond a reasonable doubt what occurred during the hours in between. To that end, Dinkins asserts the evidence linking him to the murder crosses the line from circumstantial to speculative. He supports his position by asserting: no trace of B.T.'s DNA was found on Dinkins or in any of his vehicles, no witness could confirm bleach was used to cover up any traces of a crime, nothing was shown to tie Dinkins to the murder weapon, no one witnessed Dinkins drive B.L. to the pond, and D.L.'s shifting version of events was not sufficiently reliable to support the convictions.

Under our deferential standard of review, we find sufficient evidence supports Dinkins's convictions. To begin, physical evidence and witness testimony places him at the murder scene during the early morning of July 10. When searching Dinkins's Impala, officers obtained soil samples from the undercarriage of the vehicle. An FBI minerology report matched three of the Impala samples to soil from the dirt road near the pond. Beyond the matching soil, Brink's testimony—pulling Dinkins's vehicle out of the ditch—similarly places Dinkins at the murder scene that morning. While Dinkins downplays Brink's testimony because he struggled to remember certain details, Brink accurately recalled distinctive features of Dinkins's appearance and his sworn deposition testimony was accepted by the district court as credible. Moreover, Dinkins's movements that morning were tracked by footage from various cameras and cell phone pings.

True, officers never traced the revolver back to Dinkins, but viewing all the evidence together—the physical evidence, Brink's and Andrea's testimony, and his confirmed movements leading up to the murder—the State proved Dinkins left his apartment with B.T. early in the morning, was at the pond about one hour later, never returned with B.T., and her remains were found concealed at the pond.

The State also offered evidence showing Dinkins tried to cover up his crime. Dinkins lied to officers and Aishia when he reported waking up around 8:00 a.m. and noticing B.T. was gone, and he never truthfully relayed his activities the morning of the murder. Dinkins changed clothes after leaving the pond, and despite executing search warrants at several residences, officers never found the outfit Dinkins wore while he was with B.T. He also drove to a Walmart nearly one hour away to buy bleach, forgoing a Walmart located close to the apartment where he picked up D.L. Dinkins insists that no witness ever proved that bleach was used to cover up traces of the crime, but D.L. testified to seeing Dinkins pour bleach by some bushes near the pond and later use the bleach to clean a large knife back at the motor home.

Dinkins downplays D.L.'s reliability with the details he told the investigators and retold in his testimony. D.L. was eight years old during the first stage of the criminal investigation and was eleven years old when he testified at trial. His version of events indeed evolved over time, culminating in telling his mother after B.T.'s remains were found that he was present when Dinkins shot B.T. However, he was interviewed twice shortly after B.T.'s disappearance and witnessing the shooting was not part of the information he revealed.

The district court carefully weighed D.L.'s testimony and police interviews. It found D.L.'s claim of witnessing the shooting not credible, but it also stressed that D.L. provided many other important details given shortly after the crime that were corroborated by investigating officers. For instance, D.L.'s account of being driven to a faraway Walmart and his father coming back with bleach was confirmed by store surveillance footage and a sales receipt. D.L. also described being driven to an area with woods and a hill that led down to water, which ultimately matched the description of the pond where B.T.'s remains were found. There, he saw Dinkins pour bleach by some bushes, where B.T.'s body was later found. D.L. further testified to seeing his father clean a large knife with bleach—a significant fact given that B.T.'s body was later found covered by cleanly cut branches, indicating they were cut using some sort of knife. During the investigation, officers located a machete in the home and testing revealed fibers on it, consistent with being wiped off. On the whole, after hearing all the evidence and assessing D.L. on the witness stand, the court found much of D.L.'s information credible. That is precisely the kind of informed credibility calculus that we will not second-guess on appeal. *See State v. Laffey*, 600 N.W.2d 57, 60 (Iowa 1999).

Weighing the evidence and, as we must, making all inferences in favor of the State, we find substantial evidence supports the court's findings that Dinkins removed B.T. from the apartment, transported her to the pond, and killed her. Thus, we affirm both convictions.

**AFFIRMED.**